IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Mary Mallard-Alonzeau,<br><br>                    Plaintiff,<br><br>    vs.<br><br>Michael J. Astrue,<br>Commissioner of Social Security,<br><br>                    Defendant. | Civil Action No. 6:08-3813-GRA-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security Administration that the plaintiff was not entitled to disability insurance benefits ("DIB").

**ADMINISTRATIVE PROCEEDINGS**

On September 26, 2001, the plaintiff filed an application for DIB alleging disability beginning March 14, 2001. The application was denied through the Appeals Council level, and a civil action was filed in this court (C.A. 0:03-2106-24BD). On March 19, 2004, the Honorable Bristow Marchant, United States Magistrate Judge, reversed the

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

Commissioner's decision and remanded the case for the purpose of determining the impact of the plaintiff's obesity on her functional limitations at all levels of the sequently evaluation.

Supplemental hearings were held on February 9, 2005, and June 29, 2005, after which the Administrative Law Judge (ALJ) issued a second unfavorable decision on August 13, 2005. The plaintiff requested review, and on November 23, 2005, the Appeals Council remanded the decision to another ALJ for a new hearing and decision.

Another hearing was held on June 29, 2006, after which the ALJ issued an unfavorable decision on August 15, 2006. The plaintiff filed another civil action for judicial review (C.A. 0:06-2926-MBS-BM). By order filed February 8, 2008, the Honorable Margaret B. Seymour, United States District Judge, remanded the case to the Commissioner for further proceedings, finding that the ALJ had failed to consider the combined effects of the plaintiff's impairments and explain his Listings determination.

A hearing was held on September 30, 2008, at which the plaintiff, her attorney, and a vocational expert appeared. On November 3, 2008, the ALJ found that the plaintiff was not disabled on or before December 31, 2002, her date last insured. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff was not entitled to benefits, the ALJ made the following findings:

> (1) The claimant last met the insured status requirements of the Social Security Act on December 31, 2002.
>
> (2) The claimant did not engage in substantial gainful activity during the period from her alleged onset date of March 14, 2001 through her date last insured of December 31, 2002 (20 CFR 404.1571 *et seq.*)
>
> (3) Through the date last insured, the claimant had the following severe impairments: obesity, degenerative disc disease, degenerative joint disease, and chronic low back pain (20 CFR 404.1521 *et seq.*)

2

(4) Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

(5) After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) [Sedentary work involves lifting no more than 10 pounds, sitting for up to 6 hours and standing/walking for 2 hours in an 8-hour work day.] She should have a sit/stand option at will involving no pushing or pulling with her lower extremities, occasional climbing of ramps and stairs, but no climbing of ladders, scaffolds, or ropes, occasional balancing and no kneeling, crouching, or crawling, or work around other hazards.

(6) Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

(7) The claimant was born on April 22, 1957 and was 45 years old, which is defined as a younger individual age 18-44, on the date last insured. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563).

(8) The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

(9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(10) Through the [date] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

(11) The claimant was not under a disability, as defined in the Social Security Act, at any time from March 14, 2001, the alleged onset date, through December 31, 2002, the date last insured (20 CFR 404.1520(g)).

The only issues before the court are whether the findings of fact are supported by substantial evidence and whether proper legal standards were applied.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie

4

showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

5

## **EVIDENCE PRESENTED**

The record reveals that the plaintiff was 43 years old as of her alleged onset date, and 45 years old as of her date last insured (Tr. 48-49, 67). She has a high school education (Tr. 82), and past work experience as a school bus driver and receptionist (Tr. 77, 89-98, 461-62).

### *Medical Evidence Prior to Plaintiff's Date Last Insured*

From November 2000 to February 2001, Dr. Lloyd Hepburn treated the plaintiff for morbid obesity, psoriasis, elevated blood pressure, chronic cough, probable bronchitis, leg pain, and anemia (Tr. 120-22).

On March 13, 2001, the plaintiff presented to Angela Korchari, a physical therapist, for evaluation. She was working as a school bus driver when another school bus collided with her school bus, after which she experienced low back pain. Ms. Korchari found that the plaintiff could perform sedentary work for an eight-hour day. Ms. Korchari noted that the plaintiff demonstrated "self-limiting participation" in the evaluation by stopping on eight out of 22 tasks. She stated that this might indicate that psychosocial and/or motivational factors "may be influencing physical performance." She found that "the factors underlying [Plaintiff's] limitations appear[ed] to be pain in the back and knee and obesity in stooping and squatting tasks." She stated that the plaintiff could not perform lifting, sitting, work bent over in a standing position, repetitive trunk rotation in sitting, and balancing. She recommended work conditioning and a psychosocial/motivational evaluation (Tr. 114-16).

On March 20, 2001, the plaintiff presented to Dr. Hepburn with complaints of low back pain. Dr. Hepburn found that the plaintiff had moderate lumbar paraspinal tenderness, normal reflexes, and 4/5 motor strength. Dr. Hepburn diagnosed musculoskeletal pain due to acceleration/deceleration-type injury and hypertension. He

6

prescribed Skelaxin (a muscle relaxer), Naprosyn (an anti-inflammatory), and use of a heating pad (Tr. 123). On March 30, 2001, a lumbar spine MRI study showed mild to moderate diffuse degenerative changes prominent at the L5-S1 level where the combination of mild to asymmetric disc bulging, osseous ridging/spurring, and hypertrophic degenerative changes of the facet joints impressed upon the underlying thecal sac. It also showed left sided neural foraminal stenosis (Tr. 117-18).

On April 2, 2001, the plaintiff returned to Dr. Hepburn for low back pain. He found that she had no leg weakness or numbness, and slow, but normal, gait. He found diffuse lumbar spinal and paraspinal tenderness and a grossly nonfocal neurological examination. He diagnosed low back pain, instructed the plaintiff to see an orthopedist, and recommended an MRI study (Tr. 124).

On April 12, 2001, the plaintiff saw Dr. Joseph Marzluff for evaluation. He found that she was "massively obese," and had mildly decreased range of motion of the back in all directions. Straight leg raising tests were negative on the left, but positive on the right. He diagnosed lumbar strain and prescribed Medrol (an anti-inflammatory) (Tr. 125-26).

On April 18, 2001, the plaintiff reported to Dr. Marzluff that Medrol made her heart beat faster. Dr. Marzluff recommended a myelogram for further evaluation of her low back pain (Tr. 128).

On April 19, 2001, the plaintiff presented to Dr. Steven Poletti for evaluation of her back pain. He found that she was "somewhat overweight," with limited motion of the back. He did not detect positive Waddell's signs.[2] He found positive straight leg raising

---

[2]Non-organic physical signs, termed Waddell signs, are responses to physical testing which indicate a non-physiologic basis for the patient's pain. "These signs include superficial tenderness, positive results on stimulation tests (i.e., maneuvers that appear to the patient to be a test but actually are not), distraction tests that attempt to reproduce positive physical findings when the patient is distracted, regional disturbances that do not correspond to a neuroanatomic or
(continued...)

7

tests, intact reflexes, slight bilateral extensor hallucis longus weakness, and relative dysesthesia in the posterolateral aspect of both legs. X-rays showed five to six millimeters of translation of L5 on S1 in flexion, consistent with instability/spondylolisthesis. Dr. Poletti diagnosed spondylolisthesis with back and leg pain and commented that "there [was] no simple answer here." He stated that her weight and relatively short time from injury precluded her from being an optimal operative candidate. He recommended physical therapy, epidural injections, and "off duty status" (Tr. 151).

On June 7, 2001, Dr. Poletti stated that the plaintiff's job of school bus monitor "fit within the auspices of light duty and she [was] certainly capable of doing this" (Tr. 152).

On June 15, 2001, the plaintiff underwent hysteroscopy dilation curettage, endometrial polypectomy, and cervical biopsies with endocervical curettage (Tr. 129-34).

On July 3, 2001, the plaintiff returned to Dr. Poletti for follow-up. He stated he was not sure that CT myelography was absolutely necessary. He recommended continued physical therapy and a selective epidural injection under fluoroscopy. He stated that he "ha[d] been asked if light duty work to involve being a monitor on a bus without driving the bus would be a reasonable thing. [He] said that this would be reasonable in the past and continue[d] to believe that it [was] a reasonable work option for her" (Tr. 153). Dr. Poletti also stated that she was limited to "sedentary duty [with] no lifting[,] can monitor bus activities" (Tr. 154).

On July 23, 2001, the plaintiff presented to Tom Moriarty, a physical therapist, for evaluation and treatment of her lumbosacral spine. Mr. Moriarty observed that the plaintiff's forward flexion while standing was reduced by 50 percent, her extension was

---

[2](...continued)
dermatomal distribution and overreaction during the examination. Patients who are more likely to demonstrate such non-organic signs include patients with work-related injury or those involved in litigation related to their injury." S. Craig Humphreys, M.D., & Jason C. Eck, M.S., *Clinical Evaluation and Treatment Options for Herniated Lumbar Disc*, American Family Physician, Feb. 1, 1999, at 5-6, http://www.aafp.org/afp/990201ap/575.html.

reduced by 75 percent, Waddell's simulation tests were positive, she overreacted to light palpation of her low back, and her lower extremity strength was within normal limits. Mr. Moriarty noted that she was obese and demonstrated swayback posture and positive slump. He found positive straight leg raising tests. He also noted a "positive non organic component" (Tr. 135).

On August 7, 2001, the plaintiff saw Dr. Poletti for follow-up. She said that she continued to have significant pain in her back that nonoperative care had not helped. Dr. Poletti noted that she was "overweight and had instability in her spine." He stated that she "should not return to exertional activity such as bus driving" and that "any kind of constant bending, twisting, pushing, or pulling, or lifting, perhaps greater than 25 pounds, would be contraindicated for her on a long term basis." He ascribed a 10 percent impairment rating to the whole person and found she had reached maximum medical improvement (Tr. 155).

On August 16, 2001, a lumbar myelogram showed facet arthropathy at all levels, L2-3 and L3-4 disc bulges without nerve root impingement, L4-5 central disc protrusion without nerve root impingement, and L5-S1 broad-based disc bulge impinging on the exiting left nerve root (Tr. 156-58). The plaintiff was hospitalized from August 17 through August 20, 2001, during which time she underwent total abdominal hysterectomy and lysis of adhesions (Tr. 136-43).

On September 11, 2001, the plaintiff returned to Dr. Poletti. Dr. Poletti noted the "possibility of considering surgical intervention to include fusion," but that the plaintiff "d[id] not wish to do this." He found no new neurologic deficit upon examination (Tr. 159).

On November 19, 2001, the plaintiff saw Dr. Poletti, wishing to discuss surgery. He noted that she "ha[d] a real problem." He noted that she was overweight and had unstable listhesis. He stated that he was not sure that surgery was "the best answer

9

for this large lady." He noted that the plaintiff had not made a decision regarding surgery and he would see her for follow-up as needed (Tr. 160).

On November 27, 2001, Dr. Emory Langdale examined the plaintiff at the request of the Commissioner. She complained of low back and left leg pain. She reported that she dressed and bathed independently, drove a car, cooked, did light housework, and crocheted. Dr. Langdale found that she weighed approximately 287 pounds and was "morbidly obese." He found that she had a mildly antalgic gait, mild limp on the left side, level pelvis, stretch band tenderness over her lumbar spine, poor ability to stand on her toes/heels, and the ability to semi-squat for a limited time due to knee and back pain. He found that she had normal cervical spine ranges of motion, reduced lumbar spine ranges of motion, and normal upper extremity ranges of motion, muscle strength, and reflexes. In her lower extremities, she had normal ranges of motion, muscle strength, and sensation, and positive straight leg raising tests (Tr. 161-62). On December 3, 2001, a left knee x-ray showed "some signs of osteoarthritic changes" (Tr. 163-64).

On December 21, 2001, Dr. Joseph Gonzalez, a State agency physician, reviewed the medical evidence and found that the plaintiff could perform sedentary work that did not require more than frequent use of her left leg for foot controls. He also found that she could never climb ladders, ropes or scaffolds, and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl (Tr. 175-84).

On January 4, 2002, the plaintiff reported approximately four days of complete relief of her back and left leg pain following her epidural steroid injection. She also reported some relief with a Cybertec back brace (Tr. 166). On January 7, 2002, the plaintiff underwent a lumbar epidural steroid injection at L5-S1 (Tr. 165).

On January 17, 2002, the plaintiff presented to Dr. Don Stovall for follow-up. She reported limited relief with epidural steroid injections. X-rays showed grade I L5-S1 spondylolisthesis with degenerative pars defect. Dr. Stovall diagnosed L5-S1

10

spondylolisthesis and recommended physical therapy. He did not believe that the plaintiff was a surgical candidate (Tr. 168). Dr. Stovall stated that the plaintiff could return to modified work duty with restricted climbing, bending, and stooping, and lifting of no more than 15 pounds (Tr. 167).

On February 7, 2002, Anthia Hood, a nurse practitioner, stated that the plaintiff had made no progress, her movement patterns and high level complaints of pain "show[ed] inconsistencies," and she was "not confident that [physical therapy] w[ould] be helpful for [Plaintiff]" (Tr. 170). That same day, the plaintiff presented to Dr. Stovall for follow-up. She reported continued low back and left leg pain, but was unable to say which was worse. She said she got no relief with epidural steroid injections or her back brace. Dr. Stovall found that she had normal thoracic kyphosis and lumbar lordosis, hypersensitivity in her lower lumbar regions, limited lumbar spine ranges of motion, stable pelvis, and normal thoracolumbar muscle strength and tone without atrophy or abnormal movements. He also found that she had normal hip, knee, and ankle ranges of motion, stability, and lower extremity muscle strength and tone. He further found that the plaintiff ambulated well and had normal reflexes and sensation and negative straight leg raising tests. He discontinued her physical therapy, concluded she had exhausted all conservative treatment, and recommended a functional capacity evaluation (Tr. 169, 171). Ms. Hood stated that the plaintiff could return to work with "restricted climbing, bending, [and] stooping," and weight lifting restrictions of 0-15 pounds (Tr. 169, 171).

On March 27, 2002, Dr. Stovall diagnosed the plaintiff with L5-S1 spondylolisthesis with low back injury. He found that she had reached maximum medical improvement and that any further treatment would consist of a home exercise program and aerobic conditioning. He also found that the plaintiff had a five percent regional impairment of the lumbar spine for the injury sustained and pre-existing lumbar spondylolisthesis. He

11

stated that she "would be restricted from lifting over 35 pounds on a frequent basis" and would "be able to continue to function as a bus driver" (Tr. 173).

On April 2, 2002, L. Randolph Waid, Ph.D., examined the plaintiff at the request of the Commissioner. The plaintiff reported that she spent her days watching television "with some light activities as well as cooking." She reported no cognitive difficulties such as concentration, slowed thinking, or memory problems. She admitted to problems with sadness and depression, and difficulty sleeping. Dr. Waid found that the plaintiff was experiencing a "significant depressive experience." He recommended that she undergo psychological/behavioral health intervention to provide her instruction in coping skills interventions to modulate her pain experience. He stated that "[p]sychological intervention would be brief," but would be "directed toward development of imagery/relaxation based intervention; cognitive behavioral techniques to modulate the experience of pain; appropriate management of daily activities; as well as stressing the issues of the manner in which she would return to gainful employment" (Tr. 330-33).

On April 5, 2002, Dr. F. Keels Baker, another State agency physician, reviewed the medical evidence and affirmed the December 2001 findings of Dr. Gonzalez (Tr. 182).

On April 30, 2002, the plaintiff underwent physical therapy at which she was assessed as having positive Waddell's signs (Tr. 334-35).

On June 26, 2002, Jean Hutchinson, a vocational consultant, evaluated the plaintiff and found that she "suffered a very significant impairment to her employability" and was "unable to perform the required job tasks of her former work as a school bus driver." She also stated that the plaintiff was "unable to progress to her jobs of transferability" and was "unemployable" (Tr. 189-93, 206-10).

On July 2, 2002, Dr. Douglas McGill examined the plaintiff and found that she had some guarding with transitional movements, no marked cervical region tenderness,

12

intact upper extremity strength, and some limitations of shoulder abduction. He also found that she had intact lower extremity strength and sensation, guarding to palpation of the lumbosacral region, and reduced lumbar spine ranges of motion. Dr. McGill diagnosed lumbosacral spine disease with Grade I spondylolisthesis and compression of the nerve root, left L5-S1 level, symptomatic post work-related injury, March 13, 2001, and residual chronic pain with associated difficulty with adjustment, coping, and associated sleep disturbance. He noted that psychological intervention might be of benefit "to help decrease her level of perceived disability." He recommended that she not do highly repetitive spine movements such as bending, twisting, or stooping. He recommended that frequent lifting be limited to less than ten pounds and occasional lifting to 10-20 pounds. He limited her lifting to the waist to chest level and said she should avoid any "high impact activities or activities which involve axial loading." He said that "any permanent restrictions or permanent impairment [was] deferred until she [was] placed at maximum medical improvement" (Tr. 194-97).

That same day, Dr. Gregory Jones examined the plaintiff in response to her request for a second opinion/independent medical examination. Dr. Jones found that the plaintiff weighed 295 pounds and demonstrated "significant pain behavior" during her examination. He found that, in her lower extremities, she had downgoing plantar responses, no clonus, negative straight leg raising tests, suboptimal myotomal tests with poor effort, no focal motor deficits, and normal reflexes. He also found that she had marked sacroiliac tenderness and significant lumbar tenderness. He diagnosed chronic low back pain with left sciatica, multilevel facet arthropathy at L1-2, L5-S1 with potential for left L5 root compromise, and disc bulging at L2-3, L3-4, and L4-5. He recommended an electromyogram study and stated that the plaintiff should avoid heavy lifting, pushing, or pulling greater than 30-35 pounds (Tr. 336-37).

13

On December 10, 2002, the plaintiff presented to Dr. Edward Nolan for pain management. Dr. Nolan found that the plaintiff was morbidly obese with an antalgic gait, intact upper and lower extremity strength and tone, and limited lumbar spine ranges of motion. He recommended 3-5 lumbar epidural steroid and facet joint injections (Tr. 198-99, 204-05). On December 13, 2002, Dr. Nolan stated that the plaintiff could sit, stand, and walk for less than 10 minutes each at one time, and for less than one hour each in an entire workday. He said that the plaintiff could lift and carry up to five pounds occasionally and could never bend, crawl, reach, squat, or climb (Tr. 200, 203).

### *Medical Evidence After Plaintiff's Date Last Insured*

On February 10, 2003, the plaintiff underwent an epidural steroid injection (Tr. 343). On February 15, 2003, she again saw Dr. Nolan, who found severe lumbar paraspinal muscle tenderness and bilateral knee pain to palpation. He diagnosed knee pain and lumbar facet arthropathy and recommended lumbar facet injections (Tr. 342).

On March 11, 2003, the plaintiff underwent a lumbar facet joint injection (Tr. 341). On March 12, 2003, Dr. David Jaskwhich treated the plaintiff for left knee pain. He diagnosed left knee degenerative joint disease, injected her knee with Depo Medrol and Marcaine, and prescribed a knee brace (Tr. 366-67).

Between March and August 2004, Dr. Heather Dawson treated the plaintiff for hypertension and back and leg pain (Tr. 346-53). In March 2004, a lumbar spine x-ray showed degenerative changes in the SI joints, lower lumbar facet arthropathy, disc space narrowing at L5-S1, and grade I spondylolisthesis at L5-S1 (Tr. 354).

On September 1, 2004, a lumbar spine MRI study showed vertebral subluxation of L5 on S1 with mild diffuse disc osteophyte complex and superimposed left neural foraminal disc herniation resulting in compression of the exiting left L5 nerve root and severe facet arthropathy (Tr. 344-45).

14

On March 17, 2005, Dr. Kerri Kolehma examined the plaintiff at the request of the Commissioner. Lumbar spine x-rays showed mild degenerative disc disease at L4-L5 and L5-S1 and to a lesser degree L3-L4. It also showed grade I subluxation at L5 with respect to S1, possibly due to pars interarticularis defects. Dr. Kolehma diagnosed morbid obesity, pelvic obliquity, venu valgum on the left knee, knee osteoarthritis, and spondylolisthesis at L5-S1 (Tr. 355-57, 359). She found that the plaintiff could lift and carry less than 10 pounds, stand/walk for at least two hours and sit for about six hours each in an eight-hour workday, and needed to periodically alternate between sitting and standing. She said that the plaintiff had limited ability to push/pull with her lower extremities and could never kneel, crouch, crawl, or stoop and only occasionally climb stairs and balance (Tr. 360-63).

In June 2005, Dr. Stovall continued to treat the plaintiff with epidural steroid injections (Tr. 364-65).

***Plaintiff's Hearing Testimony***

At the hearing on September 30, 2008, the plaintiff testified that she last worked on March 14, 2001 (Tr. 455). She complained of back and leg pain as a result of injuries from her school bus accident (Tr. 455-56). She said that she was unable to work due to her back/leg pain, which she estimated was an eight or a nine on a ten-point pain scale (Tr. 456-57). She said she stood and walked very little due to back and leg pain and had trouble bending and stooping (Tr. 457-58). She testified that her back treatment in 2001 and 2002 was not helpful and she used a motorized cart when she shopped at Wal-Mart (Tr. 460-61). She testified that she was depressed about her health and having to depend on her husband and children (Tr. 459-60).

15

*Vocational Expert Testimony*

The ALJ asked Robert Brabham, a vocational expert, to assume a hypothetical individual of the plaintiff's age, education, and work experience, with the following limitations:

> I want to go to sedentary, sit/stand at will, no pushing or pulling with her lower extremities. I want her to avoid ladders, scaffolds[,] and ropes; no more than occasionally on a ramp or stair. I want her to avoid kneeling, crouching[,] and crawling; and I want her to avoid hazardous environments such as unprotected heights, moving machinery.

(Tr. 462). Mr. Brabham testified that such an individual could perform the sedentary unskilled jobs of assembler, surveillance systems monitor, and machine tender (Tr. 462-63).

## **ANALYSIS**

The plaintiff alleges disability since March 14, 2001, due to lower back and left leg pain. She was 43 years old at the time of her alleged onset of disability. She has a high school education and past relevant work experience as a school bus driver and receptionist. The ALJ found that the plaintiff had the residual functional capacity to perform sedentary work with a sit/stand option at will involving no pushing or pulling with her lower extremities, occasional climbing of ramps and stairs, but no climbing of ladders, scaffolds, or ropes, occasional balancing and no kneeling, crouching, or crawling, or work around other hazards. The plaintiff argues that the ALJ erred by (1) failing to properly consider her severe depression; (2) failing to properly consider her impairments in combination; and (3) failing to properly consider the opinion evidence.

*Depression*

The plaintiff first argues that the ALJ failed to properly consider her severe depression alone or in combination with her other impairments. Dr. McGill, Dr. Waid, and

16

Jean R. Hutchinson (a certified rehabilitation counselor) all opined that the plaintiff was experiencing depression resulting from her inability to cope with her deteriorating physical condition (Tr. 189-93; 194-97; 330-33). As argued by the plaintiff, this evidence is pertinent because it supports her testimony regarding the detrimental effect this condition has had on her life since the time of the accident (Tr. 459).

Dr. Waid, a clinical psychologist, opined in April 2002 that the plaintiff experienced significant depressive symptoms resulting from her severe pain and that the psychological testing he administered indicated that she had been honest and straight-forward without exaggerating her difficulties (Tr. 332). Dr. Waid's opinion is supported by Dr. McGill's medical notes, in which he characterized the plaintiff as having residual chronic pain with associated difficulty adjusting, coping, with associated sleep disturbances, all which he found were consistent with and causally related to her deteriorating condition status post bus accident (Tr. 196). Both of these medical opinions are supported by Ms. Hutchinson's vocational report dated October 2, 2001, in which she opined that Mrs. Alonzeau suffered from significant physical and psychological problems and was unemployable as a result (Tr. 192).

The Commissioner argues that the plaintiff did not allege a mental impairment in her application for benefits and further argues that her depression is not severe because there is no evidence that she ever received treatment for depression or that her depression lasted for at least 12 months.

The plaintiff notes that she submitted the evaluation by Dr. Waid, which was conducted in April 2002, and that evaluation should have put the agency on notice that she was suffering from psychological problems as a result of her physical impairments. Further, at the hearing in 2008 before the ALJ, the plaintiff's attorney asked her about her "problems with depression" (Tr. 459-60). The ALJ did not address the plaintiff's depression in his decision. Accordingly, as argued by the plaintiff, the Commissioner's arguments on this

17

issue are *post-hoc* rationalizations not offered by the ALJ. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). Based upon the foregoing, this court agrees that the ALJ failed to properly consider the plaintiff's depression.

***Combination of Impairments***

In a disability case, the combined effect of all the claimant's impairments must be considered without regard to whether any such impairment if considered separately would be sufficiently disabling. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). The ALJ must "adequately explain his or her evaluation of the combined effects of the impairments." *Walker Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citing *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985)). In *Walker*, the Fourth Circuit Court of Appeals remanded the plaintiff's claim because the ALJ failed to adequately consider and explain his findings because he did not analyze or explain his evaluation of the cumulative effect of the claimant's impairments. *See id.* at 49-50.

Judge Seymour remanded the plaintiff's case specifically because the ALJ failed to "adequately explain his evaluation of the combined effects of Plaintiff's impairments" (Tr. 407). As argued by the plaintiff, in the present decision, the ALJ: (1)

18

completely overlooked the plaintiff's depression; (2) found that her obesity, degenerative disc disease, degenerative joint disease, and chronic low back pain were severe impairments at step two; and then (3) did not provide any rationale to support his conclusory statement that "claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments" (*see* Tr. 390-91). Based upon the foregoing, this court agrees that the ALJ failed to properly consider the plaintiff's impairments in combination.

## *Opinion Evidence*

Lastly, the plaintiff argues that the ALJ failed to properly evaluate the opinion evidence. The regulations provide that unless a treating source's opinion is given controlling weight, the ALJ must consider the weight given to any medical opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527(d)(2)-(5).

The plaintiff notes that the ALJ "does not even identify the name of the physician's opinion to which he gave controlling weight" (pl. brief 12). In his decision, the ALJ states, "a medical consultant found that the claimant could perform lifting up to 10 lbs. I agree with this assessment and give it substantial weight since I find that the claimant is capable of sedentary work" (Tr. 395). The plaintiff argues that ALJ used "backwards rationale" by picking the opinion *because* it supports his conclusion that the plaintiff is not disabled, rather than properly evaluating the opinion in accordance with the above cited regulation. Further, the plaintiff notes that the ALJ did not state his reasons for discarding the opinions of Dr. Nolan and vocational expert Hutchinson, who both opined that the

19

plaintiff had limitations inconsistent with the ability to perform any substantial gainful activity. Based upon the foregoing, this court agrees that the ALJ failed to properly evaluate the opinion evidence.

## **CONCLUSION AND RECOMMENDATION**

The record does not contain substantial evidence supporting the Commissioner's decision denying the plaintiff disability benefits. After seven years, four hearings, and two remands, this court finds that reopening the record for more evidence would serve no purpose. *See Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974) (finding that where case had been pending in the agency and courts for five years and had been remanded once before for additional evidence, reversal without remand was warranted). Therefore, based upon the foregoing, it is recommended that the Commissioner's decision denying the plaintiff's application be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the plaintiff be awarded benefits.

_____
WILLIAM M. CATOE
UNITED STATES MAGISTRATE JUDGE

December 16, 2009
Greenville, South Carolina